IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:08-CR-134 |
| | ) | |
| DEMETRIUS LAMONT PARTON, | ) | (PHILLIPS/SHIRLEY) |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on Defendant Demetrius Lamont Paron's Motion to Suppress [Doc. 13], filed on March 31, 2010. The Court held an evidentiary hearing on this motion on May 11, 2010. Assistant United States Attorney David P. Lewen appeared on behalf of the Government. Attorney Mark E. Brown represented the Defendant, who was also present. At the conclusion of the hearing, the Court asked the parties to file post hearing briefs addressing Supreme Court and Sixth Circuit case law on the issue of exigent circumstances. The Government filed its supplemental brief [Doc. 21] on May 13, 2010. The Defendant filed his post hearing brief [Doc. 22] on May 21, 2010. The Government filed a responding brief [Doc. 23] on May 28, 2010. The Court took the motion, briefs, evidence, and exhibits under advisement on June 1, 2010.

**I. POSITIONS OF THE PARTIES**

The Defendant stands charged [Doc. 1] with a single count of being a felon in

1

possession of a firearm on August 16, 2008. He asks the Court to suppress the gun seized from his bedroom on August 16, 2008, as the fruit of an illegal, warrantless search. The Defendant argues that neither probable cause nor exigent circumstances justified the entry into his home and bedroom. He contends that although bullet holes riddled the house, the Defendant's mother met the officers at the door and told them that she was the only person in the home. The Government responds that upon seeing the bullet holes in the Defendant's house and in the wall to the Defendant's bedroom, the officers were justified in entering the Defendant's home and bedroom pursuant to the exigent circumstances exception to the warrant requirement. It argues that the officers had an objectively reasonable basis to believe that someone inside the house and the bedroom needed immediate aid.

## II. SUMMARY OF THE TESTIMONY

The Government presented the testimony of Officer James Cox, who has served as a patrol officer with the Knoxville Police Department (KPD) for eight years. Officer Cox testified that around 3:00 a.m., on August 16, 2008, he and his partner Officer Nicolas Ferro received a 911 dispatch of a shooting on Linden Avenue, which was three blocks away. They arrived in the area within two minutes and encountered a white male waiving to get their attention. The white male, who was excited, frantic, and scared, said that someone had "shot up" his neighbor's house and pointed to 2520 Linden. As the officers ran to the house, they saw ten to fifteen shell casings in the road in front of 2520 Linden. Officer Cox stated that he could see bullet holes in the house. He identified five photographs [Exh. 1-5] depicting the bullet holes in the front porch railing, the front door, and the siding on either side of the front door. Because of the time of morning, Officer Cox thought that the residents might be in the house, and he was concerned that someone had been shot.

He could hear a female yelling frantically from inside the house, but he could not understand what she was saying.

Officer Cox stated that he knocked on the frame of the storm door and that Charlene Parton answered the door of 2520 Linden. She was visibly shaking, yelling into a telephone, and "freaking out." Officer Cox could not see any wounds on her person. He asked if she was hurt, and she said, "No." He asked if anyone else was in the house. Ms. Parton said, "No," and then said that she did not think so and that she was not sure if there was anyone else inside. Officer Cox felt that he could not trust her answer because she was confused. He told her that he was going to check the house. Ms. Parton shook her head affirmatively, and he asked her to step aside. Officer Cox first checked the living room, while his partner checked the kitchen and dining room. Officer Cox identified a photograph [Exh. 6] showing that bullets had penetrated the wall of the house and went through a couch in the living room. He also identified photographs [Exh. 7, 8, and 9] showing that bullets had passed through the interior wall separating the living room from what he later learned was the Defendant's bedroom. He stated that the bullet holes were concentrated on the left side of the house. While in the living room, Officer Cox noticed the odor of raw and burnt marijuana, which he recognized from his prior training.

Officer Cox testified that next to the living room and sharing the same outside wall was a room with a closed door. Officer Cox asked Ms. Parton about this room, and she said that it was her son's bedroom. He asked if her son could be in his bedroom. Ms. Parton first said, "No," but then stated that she was not sure. He stated that he did not hear screams coming from the room or see any blood, but if someone were injured, they might not be able to call for help. He told Ms. Parton that he was going into the bedroom. Officer Cox testified that when he opened the bedroom

door, a plume of marijuana smoke came out of the room. He walked around the bed in the room to look for anyone who might have fallen to the floor while injured. While in the bedroom, he saw an opened shoe box containing two large bags of marijuana on the bed. He identified photographs [Exh. 11, 12, 13, and 14] of the bedroom, depicting a bullet hole through the wall and sheet rock debris on the television, bed, and floor. Officer Cox said that he secured the bedroom while an investigator obtained a search warrant.

Officer Cox testified about a video recording [Exh. 15] taken from his in-car camera on the night in question. The recording reveals that thirty-five to forty minutes after the officers arrived at 2520 Linden, Ms. Parton was recorded while walking by the police car. Ms. Parton is still visibly shaking on the recording. Officer Cox testified that Ms. Parton was shaking worse than that when he first arrived and was yelling and confused.

On cross-examination, Officer Cox stated that he encountered no active gunfire when he arrived at the house. He knocked on the door two to three times, and Ms. Parton came to the door. He asked her to step onto the front porch. She was not hurt. Ms. Parton identified herself and the Defendant as residents of the house. When asked if anyone else was there, Ms. Parton said, "No," and then said that she did not think so. Officer Cox stated that the Defendant's bedroom door was closed when he entered the home. He said he did not ask Ms. Parton if he could go in the bedroom but, instead, told her that he was checking to see if anyone was hurt. Ms. Parton did not go into the bedroom with him. He said he asked Ms. Parton to go to the porch in case of an altercation. Officer Cox stated that there were no screams, blood, or active gunfire at the house.

Officer Cox testified about an email [Exh. 17] that he sent to Investigator Jinx at 4:49 a.m. on August 16, 2008. He acknowledged that the email states that he arrived at the residence at

4

3:15 a.m., rather than 3:00 a.m. The email states that while in the Defendant's bedroom, Officer Cox saw a torn box containing a digital scale inside the closet. Officer Cox stated that the closet door was open when he entered the bedroom. Officer Cox testified that he did not smell marijuana until he was inside the house. He stated that upon the execution of the search warrant, a handgun was found in an underwear drawer in the bedroom.

KPD Officer Nicolas Ferro testified that he had worked as a police officer for three years. Shortly after 3:00 a.m., on August 16, 2008, he and Officer Cox received a radio dispatch regarding shots fired in the area of Linden Avenue. They were approximately three blocks from that location and arrived within one to two minutes. Once on Linden Avenue, a white male waived them down. The man was excited and was pointing across the street to 2520 Linden, saying that someone had shot his neighbor's house. Officer Ferro saw shell casings on the street in front of 2520 Linden, and he and Officer Cox ran to the house, which had bullet holes in it. Officer Ferro stated that they were in a residential area, and that typically the homes in this neighborhood would be occupied in the early morning hours.

Officer Ferro stated that Officer Cox knocked on the front door, which had "webbed" cracks in the glass from the bullet holes. Officer Ferro knew someone was in the house because he could hear a woman inside screaming, but he could not understand what she was saying. The woman who opened the door was yelling into a telephone. The woman was shaking and seemed excited, nervous, and upset. The officers asked her if she was "o.k." and if anyone else was in the house. The woman said that she was "o.k.," that only she and her son lived there, and that she did not think he was home but she was not sure. Officer Ferro stated that he felt it was his duty to make sure that no one was injured. Officer Cox asked if anyone was inside. The woman said that she did

5

not know.  Officer Cox told her that they were going to come inside to check.  The woman nodded and stepped to the side.  Officer Ferro stated that this motion indicated to him that they could enter.

Officer Ferro testified that upon entering the house, he smelled marijuana but was focused on searching for injured persons.  He went to the right and checked the kitchen, hallway, bathroom, and the woman's bedroom.  When he finished checking these areas, Officer Cox was about to enter a bedroom on the left.  The interior wall between the first room and the bedroom contained bullet holes.  Officer Cox asked the woman if anyone was in the bedroom.  Officer Ferro believed the woman said that her son was not there.  Officer Cox told the woman that he had to make sure that no one was in the bedroom.  Officer Ferro characterized the woman as confused.  Officer Ferro followed Officer Cox into the bedroom.  Officer Cox went to the right of the bed while Officer Ferro proceeded straight ahead.  Officer Ferro looked under the bed but did not find anyone.  While in the bedroom, Officer Ferro saw a shoe box containing a bag of marijuana on the bed.

Officer Ferro stated that the officers called Investigator Jinx and told him that they had seen marijuana.  After Officer Ferro left the house, it was searched pursuant to a search warrant.  He testified about a portion of a video recording [Exh. 15] from that evening depicting which Ms. Parton walking in front of the police car.  Officer Ferro stated that she was nervous and shaking like she was when she opened the door.

On cross-examination, Officer Ferro testified that no active gun fire was occurring when the officers arrived on the scene.  Officer Ferro stated that he did not smell marijuana when Ms. Parton first opened the door.  He initially smelled marijuana when he was walking to the kitchen.  He stated that they did not ask Ms. Parton where the Defendant was.  He said that he saw

6

the marijuana in the shoe box after Officer Cox pointed it out.

The defense called Ms. Charlene Parton, the Defendant's mother. She stated that she owned a house at 2520 Linden Avenue and that in August 2008, the Defendant lived with her there. No one else lived at 2520 Linden at that time. She stated that on the night in question, she was asleep when she heard bullets hitting the door and the alarm sound. She was afraid and dropped to the floor. She stated that she heard the police arrive and that there was no gunfire at this time. She said that she was "a little upset" at the time she heard the officers knocking on the door. She let Officer Rivera, whom she knew, into the house. He asked her where the boys were, and she told him that they left at 11:00 p.m. She and the officer went to the hallway and smelled smoke. Officer Rivera asked which was Demetrius's room and asked about a vest that the Defendant had worn when he was stopped on a prior occasion. The door to the Defendant's room was closed, and the officers did not ask if they could go inside. Ms. Parton stated that she never gave anyone permission to look in the Defendant's room. The officers entered the Defendant's bedroom, and Officer Rivera went on one side of the Defendant's bed while the other officers went on the other side. The other officers looked in the Defendant's closet with a flashlight. Ms. Parton testified that she was told to go outside and she went. She stated that she was never asked if she was the only resident.

On cross-examination, Ms. Parton testified that she got home around 11:00 p.m., set her alarm, and went to bed. She said that she was soundly asleep and did not know what was happening when she first heard the alarm ringing. She stated that she dropped to the floor when she realized that shots were being fired. She stated that shortly thereafter, two police officers came to her door: Officer Rivera and a big policeman, not Officers Cox and Ferro. She did not recall seeing Officer Cox at her home that night, although she acknowledged that some police officers remained

7

outside the house. She said that the officer depicted in a photograph [Exh. 12] of the Defendant's room was not Officer Rivera.

## III. FINDINGS OF FACT

Based upon the testimony and the exhibits presented at the May 11 evidentiary hearing, the Court makes the following factual findings: Around 3:00 a.m., on August 16, 2008, Officers James Cox and Nicolas Ferro received a radio dispatch of a shooting on Linden Avenue. They drove the three blocks to Linden, where they encountered a man waiving them down. The man, who was excited and frantic, told them that someone had "shot up" his neighbor's house and pointed to 2520 Linden Avenue. The officers saw ten to fifteen shell casings on the street in front of 2520 Linden and bullet holes in the house. The officers ran to the front door of 2520 Linden, where they could hear a woman screaming inside.

Officer Cox knocked on the door, which was answered by Ms. Charlene Parton, the owner of the house. Ms. Parton was yelling into a telephone, was shaking, and was upset. The officers asked if she was hurt, which she denied. They then asked if anyone else was in the house. Ms. Parton first said, "No," but then stated that she was not sure. Officer Cox told Ms. Parton that the officers were going to check the house, to which she nodded in the affirmative. Officer Cox checked the living room, while Officer Ferro checked the kitchen, hallway, bathroom, and Ms. Parton's room. Both officers noticed the smell of marijuana after entering the house.

Officer Cox saw bullet holes in the interior wall between the living room and an adjacent bedroom with a closed door. Officer Cox asked Ms. Parton about this room, and Ms. Parton told him that it was her son's bedroom. When asked if her son was in his bedroom, Ms.

8

Parton first replied, "No," but then stated that she was not sure. Officer Cox told her that he was going in the bedroom. When Officer Cox opened the bedroom door, a plume of marijuana smoke escaped from the room. Officer Cox entered the bedroom, followed by Officer Ferro. The officers checked either side of the bed and the opened closet. Although no one was in the bedroom, the officers saw marijuana in an open shoe box on the bed. The officers secured the room, while an investigator sought a search warrant based upon the marijuana in the bedroom. A handgun was discovered in the search of the bedroom pursuant to the search warrant.

## IV. ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. The protections of the Fourth Amendment extend first and foremost to a person's home. See Payton v. New York, 445 U.S. 573, 585 (1980) (observing that "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed'") (quoting United States v. U.S. Dist. Ct for the E.D. Mich., 407 U.S. 297, 313 (1972)). Thus, in order for the instant warrantless search of the Defendant's residence and bedroom to pass Fourth Amendment muster, it must fall within one of the narrowly drawn exceptions to the warrant requirement. See Katz v. U.S., 389 U.S. 347, 357 (1967) (holding that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions"); Jones v. U.S., 357 U.S. 493, 499 (1958) (observing that "[t]he exceptions to the rule that a search must rest upon a search warrant have been jealously and carefully drawn"). One exception to the warrant requirement is a search based upon exigent circumstances that cause the officer to "have an

objectively reasonable basis for believing than an occupant is seriously injured or imminently threatened with such injury." Brigham City v. Stuart, 547 U.S. 398, 400, 403 (2006).

In the present case, the Government argues that the officers properly entered the house and searched the Defendant's bedroom because they were faced with exigent circumstances. The Defendant contends that (1) the officers saw nothing that would lead them to suspect reasonably that an occupant was injured and (2) even if they initially had cause to believe exigent circumstances existed, Ms. Parton dispelled that belief when she told the officers that she was not hurt and that she was the only person in the home.

"[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City, 547 U.S. at 403. For the exigent circumstances or emergency aid exception to apply, the officer must have an objectively reasonable basis for believing an emergency exists. Id. The officer's subjective beliefs are irrelevant. Id. "The Supreme Court has articulated four situations that may give rise to exigent circumstances: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." United States v. Huffman, 461 F.3d 777, 782 (6th Cir. 2006). The fourth situation–specifically danger to others–is the situation implicated in the instant case. The Government bears the burden of proving that the exigent circumstances exception applies. Id. at 783. The Court evaluates the applicability of the exigent circumstances exception based upon the "'totality of the circumstances and the inherent necessities of the situation at the time.'" Id. (quoting United States v. Rohrig, 98 F.3d 1506, 1511 (6th Cir. 1996)).

"The *sine qua non* of the exigent circumstances analysis is the existence of an

"emergency situation.'" United States v. McClain, 444 F.3d 556, 564 (6th Cir. 2005) (quoting United States v. Radka, 904 F.2d 357, 361 (6th Cir. 1990). In essence, the Defendant argues that the facts of this case did not warrant the officers' conclusion that an emergency situation existed when they arrived at the Parton residence. Comparing this case to the facts present in Supreme Court and Sixth Circuit case law, the Defendant emphasizes the absence of any indication that someone was injured, such as the officers' observation of violent actions, an actual injury, or blood. The Government responds that the officers had an objectively reasonable basis for believing that an occupant of the home could be injured, even though they did not observe violence between persons or evidence of actual injuries prior to entering the house.

To determine whether an emergency situation existed, the Court examines the totality of the circumstances known to the officers when they arrived at 2520 Linden Avenue. See Huffman, 461 F.3d at 785 (observing that the "relevant inquiry . . . is what the officers knew when they arrived" on the scene). In the early morning hours of August 16, 2008, Officers Cox and Ferro responded to a radio dispatch of a shooting on Linden Avenue. They arrived at Linden, a residential street, within two minutes and immediately encountered an excited and frantic man waiving them down. The man told the officers that his neighbor's house had been "shot up" and pointed to 2520 Linden. The officers ran toward the house. They found ten to fifteen spent shell casings on the street in front of 2520 Linden and numerous bullet holes in the house itself. When they reached the porch, they could hear female's screams coming from inside the house. Officer Cox banged on the frame of the storm door.

Charlene Parton, the homeowner, answered the door. The officers described her as shaking, "freaking out," excited, nervous, and upset. Ms. Parton testified that she was scared at the

11

time of the shooting and that she was upset when the police arrived. When she answered the door, she was yelling into a telephone. Ms. Parton confirmed that she was not hurt and told the officers that she and her son lived in the home. When asked if anyone else was in the house, Ms. Parton equivocated, at first saying, "No," and then saying that she was not sure. The Court notes that Ms. Parton testified that the officers never asked her if she were the only resident in the house. The Court finds that the evidence supports the officers' testimony on this issue: The affidavit of KPD Investigator Philip M. Jinks in support of the search warrant issued at 5:40 a.m. on August 16, 2008, states that Ms. Parton was "extremely distraught" when she answered the door and "was not responsive to the officer's questions about any possible victims inside the residence. The affidavit also states that Ms. Parton said she and her son were the only residents and that she "did not think" her son was home. Finally, Ms. Parton herself testified that she arrived home around 11:00 p.m., that her son left around that same time, that she went to sleep, and that she was sleeping soundly when the shooting occurred. Having been aroused from a sound sleep around 3:00 a.m., Ms. Parton would likely not have known whether her son had returned to the house.

Surveying the totality of the circumstances the officers experienced upon their arrival, the Court finds that the officers were faced with an emergency situation when Ms. Parton opened the door of 2520 Linden. Numerous bullets had recently passed through the wall of the house. The officers knew the house was occupied because they could hear screams from within. Although Ms. Parton, who answered the door, was not injured, she was distraught and was not sure if anyone else was inside. The Court finds that these circumstances justified the officers' warrantless entry.

The Defendant further argues that the instant facts did not give rise to "true exigent circumstances" because the officers observed no violence (no gunfire, chaotic scene, or ongoing

12

criminal activity) or signs of recent injury that would require the officers to take immediate action to insure someone's safety. In United States v. Huffman, 461 F.3d 777, 784 (6th Cir. 2006), the defendant also argued that "the officers' failure to observe blood or other signs of gun-related injuries should have signaled to them that no one was in need of immediate care." The facts in Huffman are strikingly similar to the instant facts.

In Huffman, the officers received a 911 dispatch of gunshots at a residence. Id. Upon their arrival, the officers conferred briefly with neighbors and confirmed the shooting. Id. at 785. The officers saw "multiple bullet holes in the front windows of the home as well as shards of glass on the front porch." Id. at 784. Through the windows, they could see bullet holes in the interior walls and furniture inside, which indicated the house was occupied. Id. After knocking and announcing their presence, the officers entered to check for injured persons. Id. The appellate court surveyed the case law and acknowledged that in prior cases "the officers had more definitive information that either someone was in possible danger or that someone posed a risk to the officers" but, nevertheless, held that exigent circumstances existed: "The two dispositive factors consistently found in these cases, however– the potential for injury to the officers or others and the need for swift action, . . .–are found in the present case regardless of the absence of blood or other telltale signs of injury." Id. at 785 (collecting cases). The appellate court held that the officers' belief that the shots were recent, as corroborated by the unswept glass shards on the porch, "suggested that the risk of danger was still imminent." Id.

The Court finds that those two dispositive factors exist equally, perhaps even more strongly, in the present case. The potential for injury to someone inside the house was high, given the number of bullets that had penetrated the wall and the fact that the shooting occurred in the wee

13

hours of the morning when the occupants of a home are typically present. The need for swift action was also high because the shooting had happened recently and Ms. Parton was not sure if others were inside the house. The Defendant challenges the conclusion that the shooting was recent, pointing to the fifteen minute discrepancy in the time of arrival given by the officers at the suppression hearing and stated in the search warrant affidavit and the August 16, 2008 email. The Court finds that regardless of whether the officers arrived at 3:00 a.m. or 3:15 a.m., they arrived within two minutes of the radio dispatch. An excited and frantic neighbor was still standing in the street. The broken or "webbed" glass was still in the storm door and did not fall out until the officers knocked on the door and Ms. Parton opened it. Moreover, Ms. Parton herself was still shaking and frantic. The Court finds that the totality of these circumstances reveal that the officers had an objectively reasonable basis for believing that someone inside the house could be injured when they entered 2520 Linden without a search warrant.

Finally, the Defendant argues that even if the officers believed an emergency situation existed when they arrived at the Parton residence, this belief was no longer reasonable when Ms. Parton told them that she was not injured, that she and her son were the only residents, and that her son was not home. Moreover, the Defendant argues that once inside the home, the officers did not have Ms. Parton's permission to enter her son's bedroom and that she expressly told the officers that her son was not in the bedroom.

As discussed above, the Court has already found that Ms. Parton equivocated on whether anyone else was in the residence when she met the officers at the front door. The Court also finds that she was likewise uncertain at the Defendant's bedroom door. Ms. Parton testified that the door to the Defendant's bedroom was closed, that the officers did not ask if they could enter, and

that she never gave permission for them to look in the Defendant's room. These assertions do not contradict the officers' testimony that she was confused about whether someone else was in the bedroom. Officer Cox testified that from the living room, he saw that bullets had passed through an interior wall into the adjacent room. He also stated that the majority of the bullet holes were concentrated on the left side of the house, which is where the Defendant's bedroom is located. He testified that he asked Ms. Parton about the room and that she told him that it was her son's room. He asked her if her son could be in the room, and she again equivocated, first saying, "No," and then saying that she was not sure. Officer Ferro testified that in response to Officer Cox's asking if anyone was in the room, Ms. Parton said her son was not there but that she seemed confused. Officer Ferro stated that Officer Cox told Ms. Parton that he had to make sure that no one was in the bedroom. Given the high potential for injury to someone in the closed bedroom and Ms. Parton's equivocating and confused state, the Court finds that the officers reasonably disregarded her statement that her son was not in the room.

Both the Supreme Court and the Sixth Circuit have approved law enforcement's entry pursuant to exigent circumstances over the objection of a resident of the house. See Michigan v. Fisher, 130 S. Ct. 546, 549 (2009) (per curiam); Schreiber v. Moe, 596 F.3d 323, 330 (6th Cir. 2010); Thacker v. City of Columbus, 328 F.3d 244, 254 (6th Cir. 2003). In Fisher, officers responded to a report of a "disturbance." 130 S. Ct. At 547. A couple sent them to a house where a man was "'going crazy'." Id. The officers saw damage to the fenceposts and three broken windows. Id. The front of a pickup truck in the driveway was "smashed" and blood was on the hood, on some clothing inside the truck, and on the door to the house. Id. Through a window, the officers saw Fisher screaming and throwing things. Id. In response to the officers' knocking on the

door and questions about a cut on his hand, Fisher cursed the officers and demanded that they get a search warrant. Id. The officers then entered the home, where Fisher pointed a gun at them. Id. The Supreme Court held that the officers' entry was reasonable based on the circumstances, despite the apparently mild injury Fisher suffered. Id. at 548-49. "It sufficed to invoke the emergency aid exception that it was reasonable to believe that Fisher had hurt himself (albeit non-fatally) and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else." Id. at 549. In the instant case, the Court finds that it was reasonable for the officers to believe that someone could have been in the bedroom and injured, despite Ms. Parton's statement that the Defendant was not there. Ms. Parton was confused and upset and had provided conflicting answers to Officer Cox's questions concerning who was in the residence.

In Schreiber, the Sixth Circuit found the defendant's behavior at the door of the residence to be a circumstance contributing to the officers' reasonably objective belief that someone inside the residence was in danger. 596 F.3d at 330. In this case, Officer Moe received a 911 dispatch that an anonymous caller reported that a girl at the residence in question was being beaten by her parents. Id. at 326, 330. Upon his arrival, the officer heard a male shouting inside the home. Id. A young boy answered the door, and the officer could see the defendant yelling at someone, whom he could not see. Id. The defendant came to the door, yelled profanities at the officer, and, in answer to the questions about his daughter, told the officer she was fine:

> After Moe knocked on the door and told Schreiber that Moe was concerned about [his daughter's] welfare, Schreiber abruptly told Moe to leave and bombarded him with a slew of profanities. Under such circumstances, a reasonable officer would naturally question why a father, who had just been told that the police suspected his daughter was in danger, would be so hostile and uncooperative.

Id. at 330. Thus, the court found the defendant's behavior at the door of the residence contributed

16

to the officer's reasonably objective basis for believing that the daughter was in danger of injury. See Id. 330-31. The undersigned finds that Ms. Parton's demeanor at the time of the officers' entry into her home was also a circumstance contributing to their objectively reasonable belief that someone inside could be injured.

In Thacker, officers and paramedics were dispatched to Thacker's residence after a 911 call by his fiancé reporting that Thacker was cut and bleeding. 328 F.3d at 249. When Thacker and his fiancé answered the door, the officers observed broken glass on the kitchen floor and an indentation in the wall with a liquid stain below it. Id. Thacker's hand was bleeding and he was drunk and belligerent. Id. Using profanity, Thacker stated that he had called for the paramedics not the police and invited the paramedics to come inside. Id. "After this initial exchange, the officers concluded that Thacker was not a reliable source of information and entered the apartment to investigate a possible crime, assist Thacker and any other injured persons, and determine whether it was safe for the paramedics to enter the apartment." Id. The court found the officers' warrantless entry was justified by the exigent circumstances: "[T]he totality of the circumstances, including the 911 emergency call, Thacker's conduct, and the uncertainty of the situation, justified entry to secure the safety of the police, paramedics, and other people possibly inside the home." Id. at 254. In the present case, Ms. Parton's conduct also contributed to the uncertainty of the situation, which could only be resolved by the officers entering first the house and then the Defendant's bedroom to check for injured persons. See Id. at 255.

The Defendant distinguishes both Fisher and Thacker by pointing to the obvious injuries to the person meeting the officers at the door. The Court finds that although she was not injured, bleeding, or behaving violently, Ms. Parton's demeanor–the fact that she was excited,

17

nervous, upset, confused, and generally "freaking out"–added to, rather than detracted from, the officers' basis for believing that someone in the house might be injured. Ms. Parton's demeanor corroborated the emergency nature of the situation, and her conflicting statements about the Defendant's presence in his room did not cancel out this corroboration. The Defendant distinguishes Schreiber by pointing out that once Officer Moe entered the apartment, the situation deteriorated further eventually escalating into an altercation between the defendant and the officer. The Defendant contends that in contrast, once the officers entered the Parton home, they did not encounter a chaotic scene that continued to escalate out of control. The Court finds that although perhaps the situation did not escalate, the officers investigation inside the house, specifically the bullet holes through the interior wall and the information that the room in question was a bedroom, served to heighten their belief that someone could be in need of aid. Accordingly, the Court finds that in light of her distraught demeanor and conflicting statements, Ms. Parton's statement to the officers that the Defendant was not in his bedroom did not dispel their reasonably objective belief that someone inside the Defendant's bedroom could be injured.

## V. CONCLUSION

After carefully considering the motion, briefs, testimony, exhibits, and oral arguments and after reviewing the relevant legal authorities, the Court finds that officers properly entered and searched the Defendant's home and bedroom on August 16, 2008, due to exigent circumstances. For the reasons set forth herein, it is **RECOMMENDED** that the Defendant's Motion to Suppress [**Doc. 13**] be **DENIED**.[1]

                Respectfully submitted,

                <u>s/ C. Clifford Shirley, Jr.</u>

                United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).